IN THE DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

CASE NO. 2:10-CV-2135 DCN-WOB

KAY NEWMAN, as Power of Attorney
For Mattie J. Poston                                          PLAINTIFF

VS.                     MEMORANDUM OPINION AND ORDER

BANKERS LIFE AND CASUALTY
COMPANY and
JAMES D. HARNETT                                              DEFENDANTS

This matter is before the Court on plaintiff's motion for partial summary judgment (Doc. 52), and the motions of defendant Bankers Life and Casualty Company for summary judgment (Doc. 53) and to strike plaintiff's motion for partial summary judgment (Doc. 59).

The Court heard oral argument on these motions on Friday, April 13, 2012. David Yarborough and David Lail represented the plaintiff, and Michael Griffin represented the defendants. Court reporter Debbie Potocki recorded the proceedings.

Having heard the parties, the Court issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

Plaintiff Kay Newman's mother, Mattie Poston ("Poston"), purchased a "Tax Qualified Long-Term Care Policy, Number 200,233,597" from defendant Bankers Life and Casualty Company ("Bankers") on March 17, 2000. *See* Doc. 1-3 at 1 ("Policy") (citations to internal pagination).

The Policy lists Alzheimer's and dementia as examples of "covered conditions" under the definition of "cognitive impairment." *See* Policy at 4, 12. The Policy covers nursing home, assisted living, or other similar expenses, *see id.* at 6-10, "but only to the extent that [the expenses] constitute 'Qualified Long-Term Care Services.'" *Id.*

The Policy specifically excludes services that are not "included in" the patient's "Plan of Care" or that were "paid under Medicare[1] or any other federal government insurance plan (except Medicaid)." *Id.* at 12.

The key provisions at issue are these definitional sections:

> *"Qualified Long-Term Care Services"* **means** necessary diagnostic, preventative, therapeutic, curing, treating, mitigating, and rehabilitative services and maintenance or personal care **services which are:**

---

[1] "This includes expenses that would be reimbursable by Medicare but for the application of a deductible or coinsurance amount." Policy at 12.

2

> a) ***needed*** by a Chronically Ill Family Member; ***and***
>
> b) ***provided under a Plan of Care*** prescribed by a Licensed Health Care Practitioner.
>
> \* \* \* \* \*
>
> **"Chronically Ill"** means a Family Member has been certified by a Licensed Health Care Practitioner within the preceding 12 month period as:
>
> 1. being Functionally Incapacitated for a period expected to last at least 90 days; **or**
> **2. having a Cognitive Impairment.**
>
> **"Cognitive Impairment"** means a deterioration or loss in intellectual capacity ***which requires Substantial Supervision*** to protect oneself from threats to health and safety.
>
> \* \* \* \* \*
>
> ***"Substantial Supervision" means continual supervision*** (which may include cuing by verbal prompting, gestures or other demonstrations) by another person that is necessary to protect a Cognitively Impaired person from threats to his or her own health and safety.

Policy at 4-5 (emphasis added).

Further, an "Assisted Living Facility" is defined as:

> a place providing room, board and personal care services to persons in need of assistance because of a Functional Incapacity or Cognitive Impairment, but given at a level of care less intense than that which would be received in a Nursing Home. . . An Assisted Living Facility must:
> a.   provide 24 hour a day care and services to at least 5 inpatients in one location.
> b.   have a trained and ready-to-respond employee on duty at all times to provide care;

      c.    provide 3 meals a day and accommodate special dietary needs;
      d.    be licensed by the appropriate licensing agency (if any) to provide such care;
      e.    have formal arrangements for the services of a Physician or nurse to furnish emergency medical care; and
      f.    have appropriate methods and procedures for handling and administering drugs and biological.

Policy at 7.

In February 2010, psychologist Dr. Gordon Teichner diagnosed Poston with "Probable Mixed Dementia (Dementia of the Alzheimer's Type/Vascular Dementia)" at a "moderate" severity. Doc. 53-4. He recommended that: a neurologist prescribe Poston medications that can slow the rate of cognitive decline; Poston immediately discontinue driving; and that Poston's daughter consider "nursing care options." He made the last recommendation because Poston "requires 24-hour monitoring [and] her unawareness stemming from her dementia makes her a danger to herself," such as when she decided to "go off all medication without consulting her doctor."

Shortly after Poston's diagnosis, she fell and was admitted to the hospital with a broken ankle. Poston's physicians recommended that she be placed in The Heartland Skilled Nursing Facility ("Heartland") to recuperate because it offered a restricted atmosphere with "skilled

4

nursing." Poston entered Heartland on February 13, 2010 and stayed until March 22, 2010.

Bankers did not pay for this stay at Heartland because Medicare covered this hospitalization. That stay is not at issue in this litigation.

Toward the end of Poston's Heartland stay, plaintiff, her husband, and a social worker and nurse at Heartland discussed whether Poston "could manage being in assisted living versus skilled nursing." Plf. Depo. at 34. They "wanted her to try to be as independent as possible," so they approached The Bridge Assisted Living Facility ("Bridge"), a facility Poston was familiar with because she had lived there at one point with her husband.

Poston transferred to Bridge on March 22, 2010, and she remained there until May 12, 2010, when she was again hospitalized for a fall that resulted in broken ribs. Plaintiff believed Bridge failed to properly monitor and regulate Poston's blood sugar levels and that caused the fall. *See id.* at 69. Poston never returned to Bridge.

After four days in the hospital, Poston transferred back to Heartland for recuperation and rehabilitation. *Id.* Because "she seemed to be thriving there," plaintiff and others decided to leave Poston at Heartland where "she was getting more care." *Id.* She remains there to this day.

Poston began her "Heartland 2" stay on May 16, 2010, and the very next day, plaintiff submitted a claim for Poston's new living arrangement. *See* Doc. 52 at 15 n.2. Thus, she began the claims process for the Heartland 2 stay before she received final word about the Bridge claim.

Bankers denied coverage for the Bridge stay. On April 29, 2010, Claims Adjuster Joanne Polleck initially recommended denial due to "insufficient evidence." Her rationale was that, although plaintiff explained Poston had been diagnosed with dementia/Alzheimer's, the documentation did not show that Poston met the definitions for "chronically ill" or "cognitively impaired." Doc. 53-8. After receipt of Dr. Teichner's evaluation and other information, on May 19, 2010, Claims Adjuster Debra Bilek still recommended that Bankers deny the claim. Bilek's rationale was that while Poston "did require care due to" her cognitive impairment, she "did not receive substantial supervision while at this facility." Doc. 53-9.

In a letter dated May 19, 2010, Bankers explained:

> According to your policy, to be eligible for benefits you must be certified by a Licensed Health Care Practitioner as being unable to perform (without substantial assistance from another individual) at least two Activities of Daily Living for a period of 90 days due to loss of functional capacity, ***or*** requiring ***Substantial Supervision*** to protect yourself

6

> from threats to health and safety due to Severe Cognitive Impairment.
>
> We are unable to certify that you meet the above criteria.
>
> **The provider you selected . . . Bridge . . . meets the policy requirements. You did require care due to your Cognitive Impairment, however, benefits are not payable for the care or services provided by this provider *since you didn't receive substantial supervision at this facility as required by your policy*.**

Doc. 53-11 (emphasis added). After receiving this letter, plaintiff contacted an attorney.

In a letter to Poston dated May 24, 2010, that does not specify whether it was addressing the Heartland 1, Bridge, or Heartland 2 claim, Bankers explained Poston did not meet the definition of "chronically ill" because

> Your LONG TERM CARE insurance states you must meet the policy definition of 'chronically ill' to qualify for benefits. This means you must be functionally incapacitated for a period expected to last at least 90 days, or you have a cognitive impairment.
>
> Based on the information we have, you did not meet either qualification.

Doc. 52-6.

Bankers eventually approved the Heartland 2 stay under the policy, but those benefits were not immediately

7

forthcoming.  As will be seen below, plaintiff's alleges that the delay in the payment for Heartland 2 amounts to a breach of contract and bad faith.

On July 14, 2010, plaintiff filed suit in the Charleston County Court of Common Pleas against Bankers for bad faith, negligent misrepresentation, and violation of the South Carolina Unfair Trade Practices Act ("SCUTPA") and against James Harnett, an independent agent, for negligent misrepresentation and violation of SCUTPA.

Defendants removed the action to this Court on August 16, 2010, alleging that Harnett was fraudulently joined. By order dated November 8, 2010, this Court dismissed Counts 4 and 5 of plaintiff's complaint, dismissing Harnett from the case.  (Doc. 17).[2]

Thereafter, the parties filed the motions which are now before the Court.

*Analysis*

A.  **Breach of Contract – Bridge Claim**

An insurance contract is subject to the general rules of contract construction.  *Beaufort County School Dist. v. United Nat'l Ins. Co.*, 709 S.E.2d 85, 90 (S.C. App. 2011)

---

[2] This dismissal makes it clear that the Court dismissed Counts 4 and 5 in their entirety, and plaintiff's counsel so conceded at oral argument.  Moreover, Harnettt should have been dismissed as a defendant at that time.  As this appears to have been a clerical error, the Court will order that Harnett be dismissed *nunc pro tunc*.

8

(citation omitted). "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." *Id.*

"An insurance contract is read as a whole document so that 'one may not, by pointing out a single sentence or clause, create an ambiguity.'" *Id.* "However, an insurance contract which is 'in any respect ambiguous or capable of two meanings must be construed in favor of the insured.'" (*Id.*). *See also Crossman Comtys. of N.C., Inc. v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589, 592-93 (S.C. 2011) ("The lack of clear meaning, we believe, leaves us with an ambiguity, which we must construe against the insurer.") (citation omitted).

The Court has reviewed this policy and finds it ambiguous in several respects. First, while Bankers denied coverage for the Bridge stay on the basis that Poston did not *receive* "substantial supervision" during her stay there, it is not at all apparent that such is a requirement for coverage under the policy.

The definition of "Cognitive Impairment" means, in relevant part, only that the policyholder "*requires* Substantial Supervision." (Policy at 4) (emphasis added). It is undisputed that Dr. Teichner's diagnosis of Poston

included the observation that she "requires 24-hour monitoring" due to her dementia. Doc. 52-2 at 5. Indeed, Bankers agreed that Poston "required care due to [her] Cognitive Impairment." Doc. 53-11 at 1.

Importantly, Bankers further conceded that Bridge "meets the policy requirement" for an Assisted Living Facility. Doc. 53-11 at 1.

The Court finds no basis in the policy – and Bankers cited none in its denial letter – which precludes coverage because, although Poston was placed at Bridge with the intent that she receive covered "Assisted Living Facility" services, she did not "receive" such services because the level of monitoring there did not meet expectations.

The Court also does not find persuasive Bankers's argument that the alleged "receives" requirement is present in the policy by virtue of the second prong of the definition of "Qualified Long-Term Care Services," which states that services must be "*provided* under a Plan of Care prescribed by a Licensed Health Care Practitioner." Policy at 4 (emphasis added). It bears noting that, despite the characterization of Bankers's claim denial in its brief (Doc. 53-1 at 5), Bankers did not, in fact, invoke this definition when it denied the Bridge claim. *See* Doc. 53-11 at 1.

10

Moreover, this clause appears to establish only the objective criteria for the plan of care for the patient (must be a written plan, etc.), as well as the qualifications of the healthcare provider creating the plan (*i.e.,* a licensed physician, registered nurse, etc.). To interpret this clause as excluding coverage because the policyholder, although suffering from a covered condition and admitted to a covered facility, does not ultimately receive the intended degree of care requires the Court to supply terms not found in this provision. *See Crossman*, 717 S.E.2d at 593 n.4 ("However, if insurers intend to preclude this construction, it is incumbent upon them to include clear language accomplishing this result.") (citation omitted).

Second, and independently, the definition of "Substantial Supervision" is internally inconsistent. By its very definition, the word "substantial" means something less than total: "considerable in . . . degree, amount, or extent." *The American Heritage Dictionary of the English Language* (4th ed. 2006). The policy, however, defines "Substantial Supervision" as "continual" supervision. "Continual" means, of course, "not interrupted; steady." *Id.* at 397. Therefore, "substantial" does not equal

11

"continual" in the lay sense, and this definition thus creates a patent ambiguity.

This definition is also ambiguous in light of the fact that the policy incorporates the term "Cognitive Impairment" into the definition of an "Assisted Living Facility." An Assisted Living Facility is defined as a place providing care and services to those with "Cognitive Impairments." Policy at 7. This makes sense, of course, because an Assisted Living Facility provides a lesser degree of monitoring than a Nursing Home, also covered in the policy. That persons with Cognitive Impairments – by definition those requiring only "substantial" rather than total supervision – could be adequately cared for in an Assisted Living Facility comports with the common understanding of these terms.

Further, the Court holds that the policy is ambiguous by reason of listing an "Assisted Living Facility" under the heading "Covered Expenses." This implies that the type of supervision usually provided in such a facility meets the supervision requirements for one, such as Poston, who has a "cognitive impairment."

For these reasons, the Court concludes that the policy is patently ambiguous and that Poston was entitled to coverage for the Bridge stay as a matter of law.

**B.   Bad Faith**

The Court concludes that material issues of fact preclude summary judgment in defendant's favor on plaintiff's claim for bad faith in relation to the Bridge claim.  The documentation and deposition testimony of Bankers' representatives raise jury questions as to whether Bankers's denial of this claim was objectively reasonable given the circumstances known to it at the time.

**C.   The Heartland 2 Claim**

Plaintiff also asserts breach of contract and bad faith claims as to Bankers's handling of the Heartland 2 claim.  While plaintiff's complaint is admittedly deficient in failing to delineate this claim, the parties nonetheless have conducted discovery on and briefed the issues underlying it.  Although Bankers argues that claims based on Heartland 2 should not be allowed by the Court, it argues in the alternative that there are issues of fact which preclude summary judgment on them.

The Court concludes that the causes of action related to the Heartland 2 claim have effectively been tried by consent and that the pleadings should be allowed to be amended to conform to this evidence.  *See* Fed. R. Civ. P. 15(b).

Therefore, having heard the parties, and the Court being sufficiently advised,

**IT IS ORDERED** that:

(1) The Clerk of Court terminate James D. Harnett as a defendant, *nunc pro tunc*, pursuant to the Court's prior Order (Doc. 17);

(2) Defendants' motion for summary judgment (Doc. 53) be, and is hereby, **DENIED**;

(3) Plaintiff's motion for partial summary judgment (Doc. 52) be, and is hereby, **GRANTED IN PART** as to breach of contract for failure to provide coverage for Poston's stay at the Bridge and **DENIED IN PART** as to the alleged bad faith in denying the Bridge claim and the alleged breach of contract and bad faith in the processing of the Heartland 2 claim;

(4) Defendants' motion to strike (Doc. 59) be, and is hereby, **DENIED WITHOUT PREJUDICE TO RENEWING SUCH OBJECTIONS AT TRIAL**; and

(5) **Within ten (10) days of entry of this Order,** plaintiff shall file an amended complaint setting forth her causes of action related to Poston's Heartland 2 claim, in accord with the above discussion.

This 25th day of April, 2012.



Signed By:
William O. Bertelsman   WOB
United States District Judge